**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 2:18-cr-00176-JDL |
| JOSHUA TURNER and | ) |
| CHRISTOPHER MYSHRALL, | ) |
| | ) |
| Defendants. | ) |

**ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS**

Joshua Turner and Christopher Myshrall are each charged with possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) (West 2019). Turner and Myshrall move to suppress all physical evidence and statements obtained as a result of a traffic stop of the vehicle they were traveling in (ECF Nos. 76 and 77, respectively). They contend that the stop was not supported by reasonable suspicion and was also unlawfully prolonged to conduct a dog sniff and warrantless search. For the reasons that follow, I deny the motions.

**I. FACTUAL BACKGROUND**

On the night of November 1, 2018, Trooper Matthew Williams of the Maine State Police was stationed in his marked cruiser in a closed northbound pay lane at the York toll plaza on the Maine turnpike, facing south. A little before 8:30 p.m., Trooper Williams observed a blue Honda Civic approach the toll plaza traveling north and saw two males in the blue Honda's front seats. Turner was driving; Myshrall was in the passenger seat. As the Honda approached and passed through the adjacent pay lane, Trooper Williams observed Turner sink low in his seat, clench the

steering wheel tightly, and droop his lower lip while never looking in Trooper Williams' direction. Trooper Williams interpreted these behaviors as being suspicious indicators of nervousness. After the Honda drove away from the toll plaza, Trooper Williams ran its license plate number and found that the car was registered to a woman whom Trooper Williams had not observed in the vehicle. This discovery, coupled with his observations of the Honda's driver, caused Trooper Williams to follow after the Honda, which was by then out of sight.

Trooper Williams then called Trooper Jesse Duda to see if he was in the area to provide backup on a traffic stop. The York toll plaza is located around mile 7 on the Maine Turnpike; at around mile 14, and while still catching up with the Honda, Trooper Williams passed Trooper Duda's cruiser parked on the side of the road, and Trooper Duda pulled in behind Trooper Williams to join in the pursuit of the Honda.

The troopers caught up to the Honda around mile 15 and proceeded to follow and observe the vehicle for just under 10 miles. Both troopers testified that they observed the Honda commit two traffic violations, which prompted Trooper Williams to initiate a traffic stop at around mile 24. First, the troopers observed the Honda travel almost the entire 10 miles in the center lane without moving to the right lane, in violation of 29-A M.R.S.A. § 2052(6) (Westlaw through Ch. 112, and 114 to 169 of 2019 1st Reg. Sess. of 129th Leg.), which restricts ordinary operation to the right-hand lane unless overtaking and passing another vehicle. Second, just prior to the traffic stop, the Honda signaled and pulled into the right lane too closely behind another vehicle, in violation of 29-A M.R.S.A. § 2066(1). Trooper Williams estimated that the Honda was about three car lengths behind the vehicle in front of it when it

moved to the right lane. Video footage from both Troopers Williams' and Duda's dashboard cams begins roughly 10 to 20 seconds prior to the Honda changing lanes.

At 8:33 p.m., roughly 45 seconds after the Honda moved into the right lane, Trooper Williams activated his blue lights to initiate a traffic stop. Once the Honda had come to a stop, both Trooper Williams and Trooper Duda approached the passenger side of the vehicle, and Trooper Williams asked Turner—the driver—for a driver's license, insurance, and registration. Turner provided a Maine identification card with the name "Eric Howes," along with insurance and registration information. Trooper Williams asked where Turner and Myshrall were coming from, and Turner responded that they were returning from the MGM casino in Massachusetts. Trooper Williams testified that Turner and Myshrall seemed nervous as they spoke to him. During this initial conversation, Turner asked Trooper Williams why he had been pulled over, and Trooper Williams answered that he had been following too closely.

Approximately 2 minutes into the traffic stop, Trooper Williams asked Turner to exit the vehicle and come to his police cruiser while he checked Turner's information. Trooper Williams then asked Turner if he could pat him down for weapons. Turner consented, and Trooper Williams conducted a patdown and found no weapons. Trooper Williams then asked Turner to stand at the front passenger window of his cruiser while he sat in the driver's seat and searched for Turner's information in the Maine law enforcement databases on the laptop in the cruiser. While Trooper Williams was doing so, he—along with Trooper Duda—asked Turner questions about the Defendants' trip to the casino, which Turner answered.

Roughly 4 minutes into the traffic stop, Trooper Duda began a dog sniff of the Honda with his trained K-9 partner, "Mack," who had been in Trooper Duda's cruiser. As Trooper Duda began the dog sniff, Trooper Williams told Turner that he and Myshrall seemed nervous, and that he was not sure he believed their story. Turner denied that he was nervous.[1]

Trooper Duda finished the dog sniff roughly 7 minutes and 15 seconds into the stop after Mack made a positive indication at the front of the Honda. He informed Trooper Williams that Mack had positively indicated on the Honda, and Trooper Williams relayed this information to Turner and told him that he was being detained. Trooper Williams had Turner place his hands on the front hood of the cruiser and searched him again. He found no contraband on Turner's person. While Trooper Williams searched Turner, Trooper Duda told Myshrall to exit the vehicle and place his hands on the car's roof while Trooper Duda searched him, also finding no contraband. About 11 and a half minutes into the stop, the troopers began a search of the Honda. At this point, Myshrall was leaning on the front hood of Trooper Williams' cruiser and Turner was standing roughly 15 to 20 feet in front of the Honda. Neither Defendant was handcuffed.

During the search of the Honda, Trooper Williams found a white plastic bag under the front hood in the engine compartment containing what appeared to be

---

[1] Roughly 5 minutes into the traffic stop, after asking Turner another question about his travels, Trooper Williams asked Turner to stand at the front bumper of his cruiser while he continued his check of the information provided by Turner. During this time, Trooper Williams instructed dispatch to start a "starter card" to log the traffic stop in the police data system. While verifying Turner's information, Trooper Williams discovered a felony record for either "Eric Howes" or the registered owner of the vehicle—he testified he could not remember which it was—which he reported to dispatch. Trooper Williams subsequently turned off the microphone on his dashboard camera approximately 6 minutes and 15 seconds into the stop to protect the identity of possible witnesses or confidential informants while discussing criminal history information with the dispatcher. His microphone remained off through the duration of the stop.

small packets ("tickets") of fentanyl or heroin. After finding the contraband, Trooper Williams handcuffed Myshrall and placed him under arrest. Trooper Duda handcuffed and arrested Turner at about the same time, around 14 minutes into the stop. Turner and Myshrall were subsequently transported to the State Police barracks in Portland, at which point they were read *Miranda* warnings and then questioned separately. Both Defendants agreed to answer questions.[2]

## II. LEGAL ANALYSIS

Turner and Myshrall argue, first, that the traffic stop of their vehicle was pretextual and an unreasonable seizure under the Fourth Amendment because there was no reasonable suspicion to stop the vehicle, and that all evidence discovered during and as a result of the search conducted after the vehicle was stopped must be suppressed. Second, the Defendants argue that the traffic stop was unreasonably extended without cause or a reason to interrogate them and to allow for the dog sniff, and that any evidence discovered thereafter must be suppressed. Third, the Defendants argue that the troopers lacked probable cause to conduct a warrantless search of the vehicle. Finally, the Defendants contend that they were placed in custody when each was asked to exit their vehicle, and that any subsequent statements they made before receiving *Miranda* warnings must be suppressed. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

---

[2] The record is silent as to what Turner and Myshrall told law enforcement after receiving *Miranda* warnings at the State Police barracks.

## A. The Initial Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014). Because "[a] traffic stop constitutes a seizure of 'everyone in the vehicle' for purposes of the Fourth Amendment," it "must be supported by reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). In determining whether Trooper Williams had reasonable suspicion to initiate a traffic stop of the vehicle in which Turner and Myshrall were traveling, I consider the "totality of the circumstances" and ask whether Trooper Williams had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation mark omitted).

As an initial matter, Turner and Myshrall argue that the traffic stop was pretextual, based solely on Trooper Williams' hunch that they were acting suspiciously as they passed by his cruiser at the York toll plaza. There is evidence that the Defendants are correct: Trooper Williams called Trooper Duda for backup to make a traffic stop before he had caught up to the Honda and before he witnessed any traffic violations. Nonetheless, "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011). Thus, if the

6

troopers had reasonable suspicion that a traffic violation had been committed, their ulterior motive is immaterial.

I conclude that the troopers had reasonable suspicion to stop the Defendants' vehicle for following the car ahead of it too closely. Under Maine law, "[a]n operator of a vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles, the traffic and the condition of the way." 29-A M.R.S.A. § 2066(1). Trooper Williams testified that he estimated the Defendants' vehicle was three car lengths or less behind the car in front of it, which he considered imprudent and unsafe given the nighttime conditions and the vehicle's speed, which he estimated to be around 70 miles per hour. It is difficult to discern the exact distance between the vehicles in Trooper William's dashboard video. The video does not, however, contradict the testimony that the Defendants' vehicle was very close to the car in front of it. I credit Trooper Williams' uncontradicted testimony that the Honda was driving too close to the car in front of it, which created a risk of a collision if the car in front quickly decelerated. Thus, the initial traffic stop of the Honda for following too closely was supported by the constitutionally required reasonable suspicion. *See United States v. Dunbar*, 553 F.3d 48, 55 (1st Cir. 2009) (noting that a court must "make a 'commonsense determination' that entails some deference to the perceptions of experienced officers[,]" which justified more than a reasonable suspicion to pull defendant over for following too closely).[3]

---

[3] Both troopers also testified that they had reasonable suspicion to stop the Defendants' vehicle for the traffic infraction of driving in the middle lane without returning to the right lane, in violation of 29-A M.R.S.A. § 2052(6). However, under § 2052(6), a driver may lawfully use the middle lane to overtake and pass other vehicles, and Trooper Williams testified that he did not remember if he observed the Honda passing other vehicles while it was traveling in the middle lane. He further testified that the Honda was driving legally in the middle lane during
*(continued next page)*

**B. The Search of the Vehicle**

The Defendants argue that even if the traffic stop was justified, it was unlawfully prolonged and extended. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). Here, the mission of the traffic stop was to identify the vehicle's operator and issue a warning or citation for following the car in front of it too closely. Although Trooper Williams told Turner at the outset that he had been pulled over for following too closely when Turner asked why he had been stopped, the troopers made no mention of the traffic violation again during the stop. Nonetheless, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (internal quotation marks and citation omitted).

Trooper Williams asked for Turner's driver's license, registration, and insurance information when he first approached the vehicle. Turner did not have a driver's license and instead provided a Maine identification card. It was permissible for Trooper Williams to check the information provided by Turner and to verify that

---

the minute-long period prior to the traffic stop that was captured on video. Trooper Williams' assessment is supported by the video evidence, which shows the Honda gaining distance on the traffic in the right lane. Given the countervailing evidence indicating that the Defendants' travel in the middle lane was lawful, I conclude that the troopers lacked reasonable suspicion to stop the Defendants for this alleged infraction.

Turner was licensed to drive as part of the ordinary inquiries incident to the stop. It was also permissible to ask Turner and Myshrall about their travels. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop to request identification from the driver and to inquire into the driver's itinerary."). While conducting these lawful inquiries, Trooper Williams discovered that either Turner or the vehicle's owner had a felony conviction, which merited further inquiry. *Id.* at 124 (noting that conducting criminal record searches is included in the ordinary inquiries incident to a traffic stop to ensure officer safety) (citing *Rodriguez*, 135 S. Ct. at 1616).

The dog sniff was also lawful. The Supreme Court has held that "absent the reasonable suspicion ordinarily demanded to justify detaining an individual, a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond the time necessary to handle the traffic violation that justified the stop." *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017) (internal quotation marks omitted) (quoting *Rodriguez*, 135 S. Ct. at 1615). However, a dog sniff that does not prolong "a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). Here, Trooper Duda began the dog sniff roughly 4 minutes into the traffic stop while Trooper Williams was still verifying Turner's identity and information. Trooper Duda finished the dog sniff approximately 7 minutes and 15 seconds into the stop, about the same time that Trooper Williams testified he was still verifying Turner's information, coordinating with dispatch to log the traffic stop, and investigating the criminal record related to the vehicle. Thus,

the dog sniff did not prolong the traffic stop beyond the time needed to complete the normal inquiries incident to such a stop and, consequently, did not violate the Fourth Amendment.

A positive alert by a trained drug detection dog can provide probable cause to conduct a warrantless search of a vehicle. *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle."). However, even assuming a dog is generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Florida v. Harris*, 568 U.S. 237, 247 (2013). Here, the Defendants contend, albeit in passing, that the dashboard footage failed to show an affirmative alert by Mack.

Courts must weigh the competing evidence when evaluating a challenge to a positive dog sniff. *Id.* at 248. Ultimately, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.*

The dog sniff as depicted in the video from the dashcams of Trooper Williams' and Trooper Duda's cruisers, in combination with Trooper Duda's testimony regarding the standards and techniques he employed in conducting the dog sniff, reasonably lead to the conclusion that Mack credibly alerted to the front of the Defendants' vehicle. Mack's positive alert therefore provided probable cause for the

warrantless search of the vehicle.[4] *Brown*, 500 F.3d at 57; *see also United States v. Goncalves*, 642 F.3d 245, 250 (1st Cir. 2011) (holding that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search[,]" including the engine compartment) (emphasis in original) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999)).

## C. The Defendants' Statements

Turner and Myshrall each argue that any incriminating statements they made after they were told to exit the vehicle must be suppressed because they were each in custody at that point, but they had not received *Miranda* warnings. However, at the suppression hearing, the Government stipulated that it will not seek to introduce any statements made by either Defendant after they were handcuffed and arrested and before they were given *Miranda* warnings at the barracks. My analysis is therefore limited to the statements made after Turner and Myshrall exited the vehicle but before they were handcuffed and arrested.

The Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation" made without a prior *Miranda* warning. *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984) (citing *Miranda*, 384 U.S. at 467-69, 475-77); *see also United States v. Campbell*, 741 F.3d 251, 265 (1st Cir. 2013). The

---

[4] The Government argues in its brief that the Defendants lack standing to challenge the search of the Honda because they have failed to establish an expectation of privacy in the vehicle. *See* ECF No. 87 at 7-8; *see also United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014) ("The Fourth Amendment's protection against unreasonable searches may only be claimed where a defendant demonstrates that he or she personally has a reasonable expectation of privacy in the place searched. In the context of a vehicle search, a defendant must show a property [or] a possessory interest in the automobile in order to establish a reasonable expectation of privacy.") (internal citation and quotation marks omitted) (quoting *United States v. Symonevich*, 688 F.3d 12, 19 (1st Cir. 2012)). However, because the Government failed to renew this argument at the suppression hearing, and because there are alternative grounds on which to deny the Defendants' motions, I do not address the issue.

Defendants must therefore show that they were in police "custody," and that the statements were elicited by "interrogation." *United States v. Sanchez*, 817 F.3d 38, 44 (1st Cir. 2016).

Both Turner and Myshrall contend that they were placed in custody when they were asked to exit the vehicle. However, "[w]hen a *Terry* stop is effected in connection with a traffic violation and an officer's concern for his own safety is implicated, it is within the officer's authority to order a passenger out of the car as a security measure[,]" and "an officer may issue such an order as a matter of course; he does not need to have an *independent* fear for his safety." *United States v. Ruidíaz*, 529 F.3d 25, 32 (1st Cir. 2008) (emphasis in original); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (holding that where a driver is lawfully stopped, an officer may ask the driver to step out of the car due to officer safety); *Dunbar*, 553 F.3d at 56 (although the defendant "was stopped based on a traffic violation, not on suspicion of some larger crime, we see no basis for concluding that the officer could not place [the defendant] in his cruiser while he prepared the traffic citation."). Thus, merely asking the Defendants to exit their vehicle did not automatically render them "in custody" for purposes of *Miranda*.

Furthermore, "someone questioned at a routine traffic stop in a non-coercive setting need not be given the *Miranda* warning." *United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005). Such was the case here. In determining whether someone is in custody where there has been no formal arrest, courts consider "a range of factors including (without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation."

*Id.*; *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.") (internal quotation marks omitted).

Those factors overwhelmingly indicate that Turner and Myshrall were not in custody before they were handcuffed and arrested. Here, during the period before each was handcuffed and after each exited the Honda—roughly 12 minutes for Turner and 5 minutes for Myshrall—neither Defendant was restrained, they were in a public space, and only two troopers were on scene. *See United States v. Medina*, No. 2:16-cr-94-GZS, 2017 WL 1154966, at *5 (D. Me. Mar. 27, 2017) (defendant was not in custody despite being handcuffed for approximately thirty minutes after being pulled over); *United States v. Jones*, 187 F.3d 210, 218 (1st Cir. 1999) ("[A] public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse."); *Berkemer*, 468 U.S. at 421 ("[T]he typical traffic stop is conducted in public, and the atmosphere surrounding it is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* and subsequent cases in which *Miranda* has been applied."). Further, the troopers had not, by their actions or words, indicated to Turner and Myshrall that either was under arrest or otherwise not free to terminate the encounter and leave. Because neither Defendant was in custody prior to being handcuffed and formally placed under arrest, any statements they made during that period need not be suppressed under the Fifth Amendment.

## III. CONCLUSION

For the foregoing reasons, Turner's and Myshrall's Motions to Suppress (ECF Nos. 76 and 77, respectively) are **DENIED**.

**SO ORDERED.**

**Dated this 3rd day of July, 2019.**

                                                            /s/ JON D. LEVY  
                                              **CHIEF U.S. DISTRICT JUDGE**